IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRELL A. ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 C 0584 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The Plaintiff, Darrell Robinson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency"), denying his application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1383(c)(3). Mr. Robinson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

### Procedural History of the Case

Mr. Robinson applied for SSI and Disability Insurance Benefits ("DIB")[1] on December 11, 2007, alleging that he had been disabled since October 1, 2007. (R. 177–85). The claim for SSI was denied initially, (R. 125–28), and upon reconsideration. (R. 131–33). Mr. Robinson filed a request for a hearing with an Administrative Law Judge ("ALJ") on June 25, 2008. (R. 134–36).

An ALJ convened a hearing on September 30, 2009, at which Mr. Robinson, represented by counsel, appeared and testified. (See R. 32–110). Also appearing and testifying were Ashok

---

[1] Mr. Robinson's application for DIB was denied on December 16, 2007, because he had not worked long enough under Social Security. (R. 115–17).

G. Jilhewar, M.D., a medical expert, and Grace Gianforte, a vocational expert. (*See* R. 32–110).

On July 30, 2010, the ALJ issued a decision denying the application for SSI because, "considering [Mr. Robinson's] age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 24). This became the final decision of the Commissioner when the Appeals Council denied Mr. Robinson's request for review of the decision on July 30, 2010. (R. 1–3). Mr. Robinson has appealed the decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## Evidence of Record

### A.

### The Vocational Evidence

Mr. Robinson was born on November 29, 1958 (R. 177), making him fifty years old at the time of the hearing. (R. 37). Mr. Robinson completed tenth grade and participated in special education classes since the fourth grade. (R. 52). He last worked in 2007 as a home health aide for a family friend, and worked twenty hours a week at that position. (R. 40, 42). Mr. Robinson's employment history also includes working as a laborer at a construction site in 2005 and 2006. (R. 43–44).

### B.

### The Medical Evidence

The medical records begin on May 16, 2007, when Mr. Robinson visited the emergency room at Ingalls Memorial Hospital and complained of pain in his right forearm. (R. 284). The

attending physician observed abrasions and swelling, and Mr. Robinson reported that the injury occurred during an altercation that took place two days before. (R. 284–85). Mr. Robinson had no previous medical or surgical history, and the attending physician noted that Mr. Robinson was drinking alcohol every two to three days, had a history of cocaine abuse, and had used cocaine three days before. (R. 284). Mr. Robinson reported that he had mild neck and back pain, and described the pain as "pressing" and "stabbing." (R. 285). He stated that the maximum severity of the pain was moderate, that the symptoms were mild, and denied clavicle pain, shoulder pain, inability to bear weight, pain on walking, hip pain, knee pain, ankle pain, and foot pain. (R. 285). Mr. Robinson was diagnosed with a "soft tissue contusion/infected abrasion" and was prescribed Ibuprofen, Keflex, and Neosporin. (R. 286). Ingalls Memorial Hospital discharged Mr. Robinson the same night, and the attending physician described Mr. Robinson's status as "improved." (R. 286).

On August 18, 2007, Mr. Robinson visited the emergency room at Oak Forest Hospital of Cook County and complained of right shoulder pain that radiated to his right elbow. (R. 338–39). According to Mr. Robinson, he had been experiencing pain for the previous two months. (R. 339). The range of motion of Mr. Robinson's right shoulder had decreased, and there was effusion and tenderness of the acromioclavicular joint. (R. 337). He was diagnosed with degenerative arthritis of the right shoulder and prescribed Ultram. (R. 338). X-rays taken of Mr. Robinson's right shoulder on August 23, 2007 showed no evidence of fracture, dislocation, or bony pathology. (R. 343).

Mr. Robinson returned to the emergency room at Ingalls Memorial Hospital on September 7, 2007 and complained of chronic right shoulder pain that he said had bothered him for months. (R. 304). He reported that his medication was not adequately relieving his pain, and

that his shoulder pain increased with range of motion.  (R. 304–05).  The attending physician noted that Mr. Robinson smoked tobacco (1.5 packs per day for twenty-nine years), consumed alcohol daily (including a twenty-four ounce beer and half pint on the day in question), had a history of cocaine abuse, and had last used cocaine the day before.  (R. 304).  Mr. Robinson was diagnosed with arthralgia of the right shoulder, prescribed Robaxin, and discharged the following day.  (R. 305, 308).

On September 13, 2007, Mr. Robinson visited the emergency room at Ingalls Memorial Hospital once again.  (R. 316).  He reported that the pain in his right shoulder had continued since his discharge on September 8.  (R. 316).  Mr. Robinson was diagnosed with chronic right shoulder pain and "probable tendonitis," and was prescribed Motrin.  (R. 317).  He was discharged the same day. (R. 320).  X-rays taken of Mr. Robinson's right shoulder revealed normal alignment of the right glenohumeral joint, and there was no evidence of fracture or dislocation.  (R. 327).

On October 14, 2007, Mr. Robinson returned to the Oak Forest Hospital emergency room.  (R. 342).  X-rays taken on October 15 revealed degenerative changes at the C5-C6 level of Mr. Robinson's cervical spine, but no evidence of acute fracture or dislocation.  (R. 344).  The X-rays of Mr. Robinson's right shoulder revealed slight narrowing of the joint space consistent with mild and early arthritic changes, but contained no evidence of acute fracture or dislocation. (R. 345).  Mr. Robinson was prescribed Tramadol and Robaxin.  (R. 342).

On November 19, 2007, Mr. Robinson visited the orthopedic clinic at Oak Forest Hospital, complained of shoulder pain, and was seen by Dr. Schiappa.  (R. 331).  Dr. Schiappa prescribed Mr. Robinson Tylenol #3 and Naprosyn, and recommended that Mr. Robinson return

in three weeks.  (R. 332).  Mr. Robinson returned to the orthopedic clinic on December 10 and December 21, 2007.  (R. 333–36).

On February 15, 2008, Frank Jimenez, M.D., a state agency medical consultant, completed a physical residual functional capacity ("RFC") assessment.  (*See* R. 368–75).  Dr. Jimenez opined that Mr. Robinson could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk with normal breaks for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight-hour workday, and was unlimited in his ability to push or pull.  (R. 369).  Dr. Jimenez reported that Mr. Robinson could frequently stoop, kneel, crouch, or crawl, but could only occasionally climb ladders, ropes, and scaffolds.  (R. 370).  According to Dr. Jimenez, Mr. Robinson was limited in his handling abilities (gross manipulation) and his capacity to reach in all directions (including overhead).  (R. 370).  Mr. Robinson was unlimited in his fingering (fine manipulation) and feeling (skin receptors) abilities.  (R. 371).  Dr. Jimenez noted that there was no treating source statement.  (R. 375).

On June 11, 2009, Mr. Robinson visited the emergency room at Oak Forest Hospital and complained of chronic shoulder pain and a cough.  (R. 387).  He was diagnosed with arthritis and acute bronchitis, and was advised to quit smoking and use his medication as directed.  (R. 389).  Mr. Robinson returned on July 7, 2009 and complained of pain in his left foot.  (R. 380).  The attending physician recommended that Mr. Robinson use ice, rest, and pain medication, quit smoking, and suggested that Mr. Robinson wear light shoes.  (R. 381).  The physician reported that Mr. Robinson's pain was a "one" or a "two" out of ten.  (R. 382).  Mr. Robinson was prescribed Naprosyn.  (R. 381).

On September 15, 2009, Mr. Robinson underwent an orthopedic consultative examination for the Bureau of Disability Determination Services, performed by James Elmes,

M.D.  (*See* R. 390–94).  Mr. Robinson complained of right shoulder pain and low back pain, and reported that he was previously employed as a construction worker three years before the examination, but stopped working because of pain in his right arm.  (R. 390).  According to Mr. Robinson, the pain was aggravated by lifting and elevation above shoulder height.  (R. 390).  Mr. Robinson reported that the pain on the day of the examination, with zero being no pain and ten being "the most severe possible pain," was an eight.  (R. 390).  On the best day, the pain was a six, and on the worst day, a ten.  (R. 390).  Mr. Robinson reported that his shoulder pain had remained the same for the previous six months, and that weather change, direct pressure, and lifting above shoulder elevation seemed to aggravate the pain.  (R. 390).  According to Mr. Robinson, moist heat, cold packs, massage, rest, and medication relieved the pain the most.  (R. 390).  Mr. Robinson took aspirin for the pain two to three times a day as well as Soma (one twice daily) and Naproxen (500 mg twice a day).  (R. 390).  Mr. Robinson also took Tramadol every four to six hours.  (R. 390).

As for Mr. Robinson's low back pain, he reported that he had a gradual onset of low back pain five years before the examination, and that the pain was aggravated with coughing, sneezing, urination, and defecation.  (R. 391).  Mr. Robinson reported that on the day of the examination the intensity of his back pain was a six.  (R. 391).  On the best day his back pain was a four, and on the worst day, an eight.  (R. 391).  Mr. Robinson reported that his back pain had increased in severity in the previous six months, and that weather change, lifting, twisting, and direct pressure aggravated his pain.  (R. 391).  Moist heat, massage, rest, and medication relieved the pain the most, and Mr. Robinson reported that he was able to do light shopping for short intervals and light household chores such as sweeping and taking out the garbage.  (R. 391).  According to Mr. Robinson, he experienced a decrease in strength in the left leg with

distance walking, used handrails on stairs, and had occasional decreases in balance because of left foot pain. (R. 391). Mr. Robinson reported that he experienced intermittent numbness in the lateral left foot and lateral toes. (R. 391).

Dr. Elmes noted that Mr. Robinson smoked a pack of cigarettes every day and drank beer on a social basis. (R. 391). He had a history of rectal bleeding, and his last episode occurred two weeks before the examination, possibly due to hemorrhoids. (R. 391). Mr. Robinson had decreased vision. (R. 391). He reported that he had a history of cocaine abuse, but that he had not used cocaine in thirty years. (R. 391). Mr. Robinson reported a gradual onset of left foot pain beginning six months prior to the examination, and a history of bilateral knee pain and clicking in the knees. (R. 391). Mr. Robinson's knees did not buckle or lock. (R. 391).

According to Mr. Robinson, X-rays taken of the right shoulder and the lumbosacral spine at Oak Forest Hospital in 2008 and on August 20, 2009 revealed no evidence of fracture. (R. 391). Dr. Elmes noted that no reports were available for evaluation. (R. 391). Mr. Robinson had a normal heel-to-toe gait pattern, although he complained of foot pain with walking. (R. 391). Toe standing and walking and heel standing and walking produced left foot pain, and Mr. Robinson was unable to hop as a result. (R. 391–92). Mr. Robinson reported that he could dress and undress himself without assistance, (R. 392), and although he was able to get on and off the examination table unassisted, a squat produced bilateral knee pain. (R. 392).

Mr. Robinson's fine and gross motor coordination was normal, and he could button, tie, zip, pick up a penny, turn a doorknob, and turn a key and lock without difficulty. (R. 392). He had decreased grip strength in the right hand because of right arm pain. (R. 392). He could walk fifty feet without assistance and could walk four blocks outdoors. (R. 392). Mr. Robinson was alert and oriented during the evaluation and answered all questions intelligently and without

hesitation. (R. 392). He could count to twenty-eight by sevens accurately and appeared to be able to manage his own finances. (R. 392). Sensation to light touch was decreased in the right radial forearm, although sensation to pinprick was not. (R. 392). Sensation to both light touch and pinprick was decreased in the left ulnar forearm as well as the left thumb, left index, left long, ring, and small fingers. (R. 392). Sensation to pinprick in the left radial forearm was decreased, although sensation to light touch was not. (R. 392). Dr. Elmes reported that lower extremity measurements to light touch and pinprick were decreased in a stocking-type distribution. (R. 392).

Mr. Robinson's shoulder had anterolateral and posterior tenderness. (R. 392). He had a maximum flexion of 140 degrees (150 degrees being normal) and abduction to 130 degrees (140 degrees being normal). (R. 392). Dr. Elmes reported that there was no palpable crepitus in the right shoulder, that the right knee had anteromedial tenderness, and that the left knee had anteromedial and anterolateral tenderness. (R. 392). Upon examination of the neck, Dr. Elmes reported tenderness in the right trapezius, although there was no spasm or atrophy noted. (R. 393). Examination of the back revealed mild tenderness at L4 and L5 and also in the right and left sacroiliac area. (R. 393). No palpable spasm or atrophy was noted. (R. 393). Range of motion revealed lateral bending of twenty degrees (normal being twenty-five), extension of fifteen degrees (normal being twenty-five), and forward flexion of sixty-five degrees with fingertips reaching to twelve inches from the floor. (R. 393). Dr. Elmes reported that Waddell's test revealed inappropriate results in four out of six tests, suggesting symptom magnification. (R. 393). When asked if all medical complaints had been addressed, Mr. Robinson responded affirmatively. (R. 393).

Following the examination, Dr. Elmes completed a "Medical Source Statement of Ability to Do Work Related Activities (Physical)."  (R. 395–400).  Dr. Elmes opined that Mr. Robinson could frequently lift or carry up to ten pounds, occasionally lift or carry eleven to twenty pounds, and never lift or carry twenty-one to fifty pounds or fifty-one to 100 pounds.  (R. 395).  According to Dr. Elmes, Mr. Robinson could sit or stand for fifteen minutes and walk for twenty minutes at one time.  (R. 396).  Dr. Elmes opined that Mr. Robinson could sit for five hours and stand and walk for an hour and a half in an eight-hour workday, (R. 396), and reported that Mr. Robinson required the use of a cane to ambulate.  (R. 396).

Dr. Elmes reported that Mr. Robinson could never reach over his head or push or pull with his right hand, could occasionally reach in other directions with his right hand, and could frequently perform handling, fingering, feeling, pushing, and pulling activities with his right hand.  (R. 397).  According to Dr. Elmes, Mr. Robinson could frequently reach overhead and in all other directions, and could frequently perform handling, fingering, feeling, pushing, and pulling activities with his left hand.  (R. 397).  Dr. Elmes opined that Mr. Robinson could frequently operate foot controls with his right foot, but could only occasionally do so with his left foot.  (R. 397).

As for postural activities, Dr. Elmes opined that Mr. Robinson could never climb ladders or scaffolds, kneel, crouch, or crawl.  (R. 398).  Dr. Elmes reported that Mr. Robinson could occasionally climb stairs and ramps, balance, and stoop.  (R. 398).  Dr. Elmes noted that Mr. Robinson had a visual impairment, but reported that Mr. Robinson was able to avoid hazards in the workplace, read ordinary newspaper or book print, view a computer screen, and determine differences in shape and color of small objects.  (R. 398).  However, Dr. Elmes reported that Mr. Robinson could not read very small print.  (R. 398).

In assessing Mr. Robinson's environmental limitations, Dr. Elmes opined that Mr. Robinson could never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold, or vibrations. (R. 399). However, Mr. Robinson could occasionally tolerate exposure to dust, odors, fumes, and pulmonary irritants, as well as extreme heat. (R. 399). Mr. Robinson could tolerate moderate noise. (R. 399).

Dr. Elmes reported that Mr. Robinson could perform activities like shopping, travel without a companion for assistance, ambulate without using a wheelchair, walker, or two canes or two crutches, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed himself, care for personal hygiene, and sort, handle, or use paper/files. (R. 400). However, Dr. Elmes opined that Mr. Robinson could not walk a block at a reasonable pace on rough or uneven surfaces. (R. 400).

Also on September 15, 2009, Mr. Robinson underwent a mental status evaluation for the Bureau of Disability Determination Services, performed by Robert Prescott, Ph.D., a licensed clinical psychologist. (R. 408–13). Mr. Robinson traveled to the examination by himself on the train. (R. 411). Although Mr. Robinson seemed subdued and sad, he interacted with Dr. Prescott in a cooperative and friendly manner, and his gait, posture, and mannerisms appeared to be within normal limits. (R. 408). Mr. Robinson reported that he had suffered from arthritis for the previous five or six years, and also had back pain. (R. 408). Mr. Robinson brought a number of medications with him to the evaluation including Naproxen, Salsalate, Methocarbamol, and Tramadol, and stated that he took all of the medications. (R. 409). Mr. Robinson reported that he had never had any mental health treatment. (R. 409).

Mr. Robinson reported that he drank beer once a week and tried marijuana sometime in the 1980's, but maintained that he had never had any substance abuse treatment or been in trouble with the police. (R. 409). According to Mr. Robinson, he dropped out of school after the tenth grade, and began receiving special education services in the fourth grade. (R. 409). He acknowledged that his academic skills were poor, but was "somewhat vague" about why he dropped out of school. (R. 409). Mr. Robinson reported that he had worked mostly in construction, and that his last job was for First Metropolitan where he worked for three years. (R. 409).

At the time of the evaluation, Mr. Robinson lived with his brother and his brother's fiancé. (R. 409). Mr. Robinson reported that he was able to dress and bathe himself. (R. 409). His driver's license was suspended in 1983 because of the number of tickets he received, and he had not driven since. (R. 409). Mr. Robinson stated that he could use public transportation and go to the store by himself and could also walk about four blocks. (R. 409). Mr. Robinson cooked "a little bit" and used a microwave, but did not use a computer or do laundry. (R. 409). When asked about money management, Mr. Robinson responded that he "c[ould] count." (R. 409). Mr. Robinson's chores around the house were to pick up after himself and sweep, and he was not involved in any activities outside the house. (R. 409).

When asked about his daily routine, Mr. Robinson responded that he watched television, and sometimes sat outside. (R. 410). Mr. Robinson had some friends and had a girlfriend of four months, and stated that he and his girlfriend "might go to the movies together." (R. 410). He had no difficulty in getting along with coworkers or his brother and his brother's fiancé. (R. 410). When asked about any worries or concerns, Mr. Robinson responded, "how I'm going to make it." (R. 410).

Mr. Robinson reported that he had been depressed for the previous five years because he had not been working. (R. 410). Mr. Robinson occasionally cried and was unsure about his future, (R. 410), and stated that he had difficulty sleeping for the past five years. (R. 410). According to Mr. Robinson, his appetite had been poor. (R. 410).

Mr. Robinson spoke at a "slower than usual rate." (R. 410). Although he was sometimes hesitant in providing answers, his words were well articulated and he was understandable ninety percent of the time. (R. 410). He seemed to understand Dr. Prescott ninety percent of the time. (R. 410). Mr. Robinson denied any suicide attempts and did not disclose any attempt to harm himself, but did acknowledge that he had some suicidal thoughts. (R. 410). When asked for more information, Mr. Robinson responded that he told himself to "hold off and maybe things will get better." (R. 410). He did not reveal any auditory or visual hallucinations, but reported that he had some problems with his memory and forgot about social events and phone numbers. (R. 410).

Mr. Robinson was aware of the date, his birth date, his age, and his location. (R. 411). He was able to recall four digits forward and three reversed, and when given five words to learn, learned all five on his second attempt. (R. 411). However, after five minutes, he was unable to remember any of the five words, but was able to accurately recall four after given hints. (R. 411). He was able to name five large cities, the most recent and next holidays, and an individual recently in the news. (R. 411). Mr. Robinson was able to perform some basic calculations, but improperly answered others. (R. 411).

After spending forty minutes with Mr. Robinson, Dr. Prescott diagnosed him with major depression, moderate alcohol abuse (in partial remission), and a learning disability. (R. 412). Dr. Prescott opined that Mr. Robinson had a mild limitation in his ability to understand and

remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. (R. 414). Dr. Prescott determined that Mr. Robinson had a moderate limitation in his ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. (R. 414). According to Dr. Prescott, Mr. Robinson had a mild limitation in his ability to interact appropriately with the public, his supervisor, his coworkers, and to respond appropriately to usual work situations and to changes in a routine work setting. (R. 415). Dr. Prescott added that Mr. Robinson had "very poor computational skills." (R. 415).

Following the hearing with the ALJ, Mr. Robinson underwent a psychological evaluation with Nicolette Puntini, Ph.D on October 2, 2009. (R. 420–24). Mr. Robinson arrived at the evaluation on time, and had taken public transportation by himself. (R. 420). He was cooperative and his statements were relevant and coherent. (R. 422). He reported that he had recently moved in with his girlfriend, and that he had lived with relatives for most of his life who were able to help him read his mail and fill out important documents. (R. 421). However, Mr. Robinson did report that he lived alone in a government-subsidized apartment in Indiana for about five years. (R. 421).

Mr. Robinson completed the Wechsler Adult Intelligence Scale-III and obtained a Full-Scale IQ of 76, a Verbal IQ of 78, and a Performance IQ of 78. (R. 422). Mr. Robinson's specific, age-adjusted, scaled scores revealed an overall intellectual functioning in the Borderline range. (R. 422). His overall verbal intellectual functioning fell into the Borderline range. (R. 422). Mr. Robinson's fund of available information was his poorest subtest score, and fell into the Mentally Retarded range. (R. 422). His vocabulary fell into the Low Average range, and his mental arithmetical ability fell into the Borderline Range. (R. 422–23). His short-term memory

for numbers fell into the Average Range, and his social judgment fell into the Low Average range. (R. 423).

Mr. Robinson's abstract concept formation fell at the Low Average range, (R. 423), and his overall perceptual-related intellectual functioning fell into the Borderline range. (R. 423). His ability to differentiate essential from nonessential information fell at the Borderline range, and his planning ability fell at the Average range. (R. 423). Finally, his ability to concentrate and sustain attention on a rote digit-symbol copying task fell at the Borderline range. (R. 423).

Mr. Robinson's Wide Range Achievement Test-3 results revealed that his reading skills fell at the sixth-grade level, and his spelling skills fell at the first-grade level. (R. 424). Dr. Puntini concluded that Mr. Robinson's intellectual functioning fell within the Borderline range of intelligence, that he had a history of special education classes, and that his spelling skills were very poor. (R. 424).

### C.

### The Administrative Hearing Testimony

### 1.

### Mr. Robinson's Testimony

At the time of the hearing, Mr. Robinson was fifty years old and had no source of income. (R. 37, 48). He had not worked since 2007 when he took care of a friend of the family. (R. 40–41). In that position, Mr. Robinson performed household chores and went to pick up her prescriptions. (R. 41). He cleaned the kitchen and living room and cooked, but did not help her bathe. (R. 43). At first Mr. Robinson had to lift the patient, but when he started having back problems, his brother would lift her. (R. 42–43). Mr. Robinson testified that he was paid $4.35

an hour, worked four hours a day, and worked twenty hours a week. (R. 42). He left this job in 2007 because the woman entered a nursing home. (R. 46).

Mr. Robinson did not have a driver's license, and testified that he lost it in 1981 because his vision deteriorated and he received numerous tickets for moving violations. (R. 41). Mr. Robinson testified that when he received his license initially, he had to pass a written examination and a driving test. (R. 42). He testified that he was able to understand and answer the questions on the written test because he studied for it with his brother and sister. (R. 70).

Before helping the family friend in her home, Mr. Robinson worked a construction job as a laborer. (R. 43). In this position, Mr. Robinson had to lift "[a] lot of heavy stuff" including concrete, and frequently put concrete in wheelbarrows and pushed the wheelbarrows to their destination. (R. 44). Mr. Robinson left the construction job because he could no longer lift. (R. 44–45). He testified that he was unable to raise his right arm over his head, and that his right hand "would give out on" him. (R. 45). Mr. Robinson did not work between 1995 and 2005 because he could not find a job, (R. 45), and had trouble filling out the applications on his own. (R. 45). Although Mr. Robinson did not have a steady job during this time period, he testified that he frequently worked as a day laborer. (R. 46).

After Mr. Robinson stopped working as a home aide for a friend of the family, he applied for and received unemployment benefits that stopped a few weeks before the hearing. (R. 46). According to Mr. Robinson, he received $181 every two weeks. (R. 49). Mr. Robinson testified that he smoked half a pack of cigarettes a day, and that at one time, he had smoked more. (R. 49). He only drank beer "for a football game or something" on Sunday nights, (R. 49), and on those occasions he drank two beers "at the most." (R. 50). Mr. Robinson acknowledged that he abused marijuana when he was a teenager, and used the drug for a year or so. (R. 50). He was

never arrested for marijuana use, but was arrested after having an altercation with his girlfriend two or three years before the hearing. (R. 50). Mr. Robinson testified that he had never taken cocaine, although he acknowledged that there might have been cocaine in the marijuana he used. (R. 50–51).

Mr. Robinson reported that he could go grocery shopping, read some food labels, and understood how much money to pay at the grocery store. (R. 52–53). He could read some street signs, was able to take public transportation by himself, and traveled to the hearing by bus with his girlfriend. (R. 53). He did not remember the hearing on his own, and was reminded by his girlfriend. (R. 53–54). Mr. Robinson testified that he his girlfriend "kep[t] everything right now for me because I don't remember." (R. 54). When Mr. Robinson had various consultative examinations, he took the train with his girlfriend to the appointments. (R. 54).

Although Mr. Robinson could not make out the names of his medications, he testified that he took them for his arthritis and lower back pain. (R. 54). Most of the time he remembered to take his medicine, but occasionally had to be reminded by his girlfriend. (R. 54). Mr. Robinson testified that he took his medication three times a day, and because he couldn't read the labels, had a color marker on the top of each bottle to identify which prescription to take. (R. 55). According to Mr. Robinson, he never received treatment for depression or any type of mental illness. (R. 55).

Mr. Robinson testified that he could dress himself, and although he experienced slight pain while putting on his socks and shoes, he acknowledged that if he had to he could "just go through a little pain and get it done." (R. 56). Mr. Robinson lived with his girlfriend, and had previously lived with his brother and his brother's wife for four or five years. (R. 57, 59). When Mr. Robinson lived with his brother, he had to climb twenty to twenty-five stairs to get to the

16

apartment, and did so two or three times a day, although he tried not to do it at all. (R. 58). Mr. Robinson testified that he did not go outside on a daily basis, (R. 58), and that he picked up after himself and cleaned the area where he slept. (R. 59).

Mr. Robinson reported that he needed to climb up ten steps to reach the front porch of his girlfriend's house. (R. 59). During the day, Mr. Robinson mostly rested and watched television, and testified that he understood "some" of what was happening in the television shows. (R. 59–60). Mr. Robinson took naps "most every time" he took his medication. (R. 60).

When asked how far he could walk without resting, Mr. Robinson responded that he could walk for about fifteen minutes. (R. 61). When asked how long he could stand without taking a break, he responded "[m]aybe ten minutes," and when asked how long he could sit, Mr. Robinson responded that he "could sit maybe an hour, hour and a half, something like that." (R. 62). Mr. Robinson testified that he could reach over his head with his left arm, but not his right. (R. 62). When asked to demonstrate how far he could reach with his right arm, Mr. Robinson raised his right arm to a height slightly lower than his shoulder. (R. 63). When asked if he could touch each finger to his thumb on each hand, Mr. Robinson responded that he could do it with his left hand, but not his right. (R. 63). The ALJ asked if Mr. Robinson could not do it with his right hand, or if it merely hurt when he did, and Mr. Robinson responded, "[n]o, it hurts when I go to do it." (R. 63).

Mr. Robinson was able to put both hands down flat on the table in front of him. (R. 64). He testified that he could pick up a paperclip from the table with either hand, but that if he picked it up with his right hand, it would be painful. (R. 64). According to Mr. Robinson, he "sometimes" went grocery shopping by himself, and he testified that he could carry a gallon of milk home depending on how far he had to walk with it. (R. 65). Mr. Robinson testified that if

he only had to walk from the corner, he "could make it down there and back with it."  (R. 65).

Mr. Robinson testified that he could push twenty pounds in a grocery cart.  (R. 66).

When asked about the doctor's report that noted that Mr. Robinson had stated that he used cocaine three days before the incident, Mr. Robinson insisted that he had not used cocaine. (R. 66–67).  He stated that he "might have tried cocaine before" but maintained that he had no history of cocaine abuse.  (R. 67).  Mr. Robinson acknowledged that he drank every two to three days in 2007, but stated that he no longer drank except for once a week, and that he had stopped drinking more heavily six months before when he met his girlfriend.  (R. 67).

Mr. Robinson testified that he could not and had never used a computer, did not have and had never had a checking account, and didn't know how to use checks.  (R. 68–69).  When he was working, he would cash his paycheck to pay his bills.  (R. 69).  When he lived with his brother, Mr. Robinson would pay his brother in cash to help pay for the electric and gas bills, and to pay his brother rent.  (R. 69).  While he was still receiving unemployment benefits, Mr. Robinson had a similar relationship with his girlfriend, but at the time of the hearing, he had no arrangement with her.  (R. 70).

At his construction jobs, Mr. Robinson did not have to do any reading, although he did need to read the measuring tape.  (R. 71).  He was also not required to do any math.  (R. 71). When asked how he would have traveled to the hearing alone, Mr. Robinson responded that he probably would have asked the bus driver.  (R. 72).

When asked about the pain in his shoulder, Mr. Robinson testified that it was "terrible," "harsh," and "bad," particularly when it rained.  (R. 73).  He continued that the pain was "like electric shock or something going through you, like a wire, it's a hot wire or something," and that it traveled from his shoulder down to his fingers.  (R. 73).  Mr. Robinson testified that he

had pain every day, particularly if he didn't take his medication. (R. 73). He stated that his medication helped with the pain, and when asked about his side effects, responded that he had dry mouth and that the medication put him to sleep. (R. 73–74). He continued that the medication made him "drowsy and sleepy." (R. 74).

Finally, Mr. Robinson testified that his new medical card from Oak Forest Hospital enabled him to receive his medication for free. (R. 75). When he received mail, he gave it to his girlfriend to read aloud, and testified that he could write his girlfriend a note if he had to leave the house. (R. 75). Mr. Robinson testified that if his girlfriend left him a note, he could read some of it. (R. 75).

## 2.

## The Medical Expert's Testimony

Ashok G. Jilhewar, M.D., then testified as an impartial medical expert ("ME"). (R. 75–97). The ME testified that the most documented impairment was right shoulder pain, and recounted the medical evidence regarding Mr. Robinson's shoulder, back, and knee pain. (R. 76–79). According to the ME, the clinical findings at the September 2009 consultative examination performed by Dr. Elmes were inconsistent with Mr. Robinson's testimony. (R. 79–80). Mr. Robinson testified that he could only lift his shoulder to just below shoulder level, or eighty degrees, while at the consultative examination Mr. Robinson was able to lift his shoulder to 130 degrees. (R. 80). The ME also disagreed with the state agency medical consultants' assessment of gross manipulations, and testified that no specific records indicated the degree of limitation in the findings, except for Mr. Robinson's right arm pain. (R. 81). The ME acknowledged that decreased sensory function may impair an individual's ability to

assemble small objects of less than a one-inch diameter, but opined that despite such a limitation, an individual should be able to pick up paperclips.  (R. 82).

The ME opined that Mr. Robinson's history of alcohol and drug use had no impact on his impairments.  (R. 84).  Based on the ME's review of the medical records, Mr. Robinson's impairments did not meet or medically equal any impairments listed in the Commissioner's regulations.  (R. 84).  He explained that, at the most, Mr. Robinson was only impaired in one hand and that his gait was normal.  (R. 84–85).  The ME acknowledged that he is not an orthopedic surgeon, but testified that, to a reasonable degree of medical and surgical certainty, Mr. Robinson could perform sustained work at a light level.  (R. 85).  The ME added that Mr. Robinson could only occasionally reach over his head with the right arm.  (R. 85).

The ME disagreed with Dr. Elmes' physical assessment, and explained that the assessment was inconsistent with Dr. Elmes' findings that Mr. Robinson had a normal gait and "relatively good" motion of the lumbar spine.  (R. 86).  Further, the ME testified that "Aleve does not cause drowsiness," and that the only medication taken by Mr. Robinson that could cause drowsiness would be Robaxin.  (R. 88).  The ME acknowledged that the records were "skimpy," and testified that the treatment records did not come to a specific conclusion.  (R. 97).

### 3.

### The Vocational Expert's Testimony

Grace Gianforte then testified as an impartial vocational expert ("VE").  (R. 97–106).  The VE testified that Mr. Robinson's previous employment in the construction industry constituted that of a "concrete laborer" that is described by the Department of Labor as "very heavy," and that his employment as a home attendant was "medium."  (R. 98).  When asked to assume a claimant with Mr. Robinson's age, education, work experience, and RFC, the VE

opined that the hypothetical person could not perform Mr. Robinson's past relevant work, but assessed that this person could perform a number of light unskilled jobs including that of a cafeteria attendant (5,000 positions in the area), light cleaner (10,000 positions in the area), or food product sorter (800 positions in the area). (R. 98–99).

According to the VE, an inability to reach overhead would not change her assessment (R. 99–100). However, if an individual were unable to reach in all directions, such a limitation would be "serious" as about ninety-two percent of all occupations in the national economy require reaching and handling on a frequent to constant basis. (R. 100). The VE opined that an inability to reach in all directions with the dominant arm would preclude the work mentioned in the initial hypothetical. (R. 100–01). If "close supervision" were added to the hypothetical, the VE testified that such a limitation would be inconsistent with the standards for competitive employment, and opined if an individual had to be reminded of tasks two times a day, the individual would be unable to perform work in the national economy. (R. 101–02). Finally, when asked to assume a claimant with the limitations recorded in Dr. Elmes' "Medical Source Statement of Ability to Do Work Related Activities (Physical)," the VE opined that such an individual would be, at best, limited to sedentary and unskilled work but could perform the work of an electrical and electronics products assembler (3,000 positions in the area), polisher (1,000 positions in the area), or bench hand worker (1,400 positions in the area). (R. 102–04).

## D.

### The ALJ's Decision

After finding that Mr. Robinson had not engaged in substantial gainful activity ("SGA") since December 11, 2007, the application date, the ALJ determined that Mr. Robinson had the following severe impairments: degenerative joint disease, right shoulder; degenerative disc

disease, cervical spine; borderline intellectual functioning; and polysubstance abuse. (R. 12). The ALJ acknowledged that Mr. Robinson had a history of degenerative joint disease of both knees, but determined that these were non-severe impairments, and did "not account for more than minimal functional limitations in the claimant's ability to perform basic work activity." (R. 12). The ALJ explained that Mr. Robinson was assessed with bilateral knee pain with crepitus at the September 15, 2009 consultative examination, but at that time his gait was normal and his range of motion was "generally unremarkable." (R. 12). Further, the ALJ concluded that there was little evidence of any continued treatment or complaints regarding Mr. Robinson's knees, and that his RFC would more than adequately account for any limitation resulting from Mr. Robinson's knee pain. (R. 12).

The ALJ then determined that Mr. Robinson's impairments, considered singly and in combination, did not meet the criteria of any listed impairments in the Commissioner's regulations. (R. 12–14). According to the ALJ, "no treating or examining physician ha[d] identified findings equivalent in severity to the criteria of any listed impairment, and in particular listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine)." (R. 12–13).

The ALJ then considered Mr. Robinson's mental impairment under the requirements of Listing 12.05, which covers mental retardation and which requires that the criteria of paragraphs A,B, C, or D are satisfied. (R. 13). The ALJ determined that paragraph A—met when mental incapacity is evidenced by dependence on others for personal needs—was not satisfied because Mr. Robinson was "able to bathe and dress himself, shop, count change, and use public transportation by himself." (R. 13). Further, the ALJ reasoned that Mr. Robinson lived alone in the past, and worked in the construction industry and as a home care attendant. (R. 13).

Paragraph B was not met because Mr. Robinson did not have a valid verbal, performance, or full scale IQ of 59 or less. (R. 13). Similarly, paragraph C was not satisfied because Mr. Robinson did not have a valid verbal, performance, or full scale IQ of 60 through 70, or a physical or other mental impairment imposing an additional and significant work-related limitation of function. (R. 13). Finally, the requirements of paragraph D were not met because Mr. Robinson's IQ scores exceeded 70, and the ALJ concluded that based on the evidence in the record, Mr. Robinson's mental impairment "result[ed] in mild restrictions of daily living; mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and no episodes of decompensation."[2] (R. 14).

The ALJ then determined that Mr. Robinson had the RFC to perform light work, with the exceptions that he could only occasional climb ladders, ropes, or scaffolds, and limited reaching above shoulder level with the right arm. (R. 14). In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence," (R. 14), and concluded that while the medically determinable impairments could be expected to cause the alleged symptoms, "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the" RFC assessment. (R. 15). According to the ALJ, the record did not indicate that either Mr. Robinson's borderline intellectual functioning or his degenerative disease of the cervical spine and right shoulder precluded him from engaging in light work. (R. 15, 17). Further, the ALJ asserted that the RFC took Mr. Robinson's degenerative disc and joint diseases into consideration, and adequately

---

[2] The ALJ noted that the paragraph D analysis did not amount to an RFC assessment, and that the RFC used at steps four and five of the sequential evaluation process required a more detailed assessment. (R. 14).

accounted for those limitations by limiting Mr. Robinson to light work, occasional climbing of ladders, ropes, or scaffolds, and reaching above shoulder level with the right arm. (R. 15). By restricting Mr. Robinson to unskilled work, the RFC adequately considered Mr. Robinson's mental limitations as well. (R. 17).

The ALJ then summarized the medical evidence including Mr. Robinson's emergency room visits in 2007 and 2009, and the X-rays taken of Mr. Robinson's right shoulder and cervical spine. (R. 15–16). The ALJ considered the consultative examination and medical source statement completed by Dr. Elmes on September 15, 2009 and the psychological consultative examination performed by Dr. Prescott on the same day. (R. 16–18). The ALJ also noted the psychological evaluation performed by Dr. Puntini on October 2, 2009, and the ME's testimony. (R. 18, 20).

In addition to the objective medical evidence, the ALJ evaluated the intensity, persistence, and limiting effects of Mr. Robinson's symptoms, and concluded that "numerous factors mitigate[d] against a finding for greater restrictions than outlined in the" RFC assessment. (R. 18). The ALJ noted that the state agency medical consultants who reviewed the record on February 15 and June 2, 2008 concluded that Mr. Robinson retained the RFC to perform light work. (R. 18). The ALJ, however, found that the assessed manipulative limitations were without support.[3] (R. 18–19). In addition, the ALJ found that Dr. Elmes' physical assessment was more extreme than "his only mildly abnormal clinical findings and findings of symptom magnification would suggest and support." (R. 19–20). The ALJ reasoned

---

[3] The ALJ also noted that Mr. Robinson's counsel argued in pre-hearing and post-hearing memorandums that the state agency RFC assessment was not entitled to any weight because it referenced a December 21, 2007 consultative examination which was not in the record. (R. 19). The ALJ found this argument to be without merit as the reference to December 21 was contained in the summary of the medical evidence, and did not refer to a consultative examination but to an orthopedic consult performed at Cook County Hospital which appears in the record . (R. 19).

that the ME disagreed with Dr. Elmes' physical assessment, and he gave "great weight to [the ME's] physical assessment as . . . most consistent with the medical evidence of record, including the clinical findings of Dr. Elmes."  (R. 20).

The ALJ noted that the record did not contain any opinions from treating or examining physicians indicating that Mr. Robinson was disabled, and reasoned that "[g]iven the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on [Mr. Robinson] by the treating doctor."  (R. 21).  The ALJ continued that, in general, Mr. Robinson did not receive the medical treatment one would expect a totally disabled individual to receive.  (R. 21).  Mr. Robinson occasionally visited the doctor and received "routine and/or conservative" treatment.  (R. 21).  The ALJ considered the fact that Mr. Robinson had been medically indigent until recently, but reasoned that the record indicated that Mr. Robinson was capable of visiting the emergency room and seeking medical assistance when necessary.  (R. 21).  In addition, the ALJ concluded that Mr. Robinson's use of medication did not result in another impairment.  (R. 21).  The ALJ noted that Mr. Robinson testified that his only medication side effect was dry mouth, but when prompted by his attorney, testified that his medication caused drowsiness.  (R. 21).  The ALJ found Mr. Robinson's alleged side effects of drowsiness to be unsupported by the record.  (R. 21).

While Mr. Robinson described fairly limited daily activities, the ALJ concluded that two factors weighed against considering these allegations to be evidence in favor of finding Mr. Robinson disabled: First, the limited daily activities could not be "objectively verified with any reasonable degree of certainty," and second, even giving Mr. Robinson the benefit of the doubt, it would be "difficult to attribute that limitation to [Mr. Robinson's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors

discussed in" the decision. (R. 21). The ALJ reasoned that Mr. Robinson reported that he was able to dress himself and take care of his personal needs, and found Mr. Robinson's allegation that he received assistance while climbing the stairs to be inconsistent with his ability to go out alone. (R. 21). Further, Mr. Robinson's past work in the construction industry was classified by the VE at the "very heavy exertional level," and the VE testified that unskilled work does not require reading and writing. (R. 22). The ALJ noted that Mr. Robinson originally obtained his license after passing a written examination, and only lost his license because he received too many tickets, rather than due to a physical or mental condition. (R. 22). The ALJ further reasoned that Mr. Robinson could leave basic notes for his girlfriend, and had been able to function independently for a number of years. (R. 22). Although Mr. Robinson's work in construction and as a home attendant was not considered past relevant work, the ALJ reasoned that "without any evidence of any worsening in the claimant's mental abilities and cognitive functioning, the fact that [Mr. Robinson's] mental impairment did not prevent [him] from working at that time strongly suggests that it would not currently prevent [him] from working at the unskilled level." (R. 22).

Finally, the ALJ noted that evidence in the record indicated that Mr. Robinson was not an entirely reliable source. (R. 22). For example, although Mr. Robinson reported in his internal medicine consultative examination that he had last used cocaine thirty years ago, he reported in the emergency room on May 16, 2007, that he had used cocaine three days before, and reported in the emergency room on September 7, 2007 that he had used cocaine the day before. (R. 22). The ALJ also noted that Dr. Elmes found that Mr. Robinson had exaggerated his symptoms, and concluded that Mr. Robinson's allegations as to the disabling nature of his impairments were not supported by the record. (R. 23).

The ALJ found that Mr. Robinson had no past relevant work. (R. 23). However, based on the VE's response to the hypothetical person with Mr. Robinson's limitations, the ALJ determined that a significant number of jobs existed in the national economy that Mr. Robinson could perform. (R. 24). The ALJ ultimately concluded that Mr. Robinson had not been under a disability since December 11, 2007, the date the application was filed. (R. 24).

## III.

## Analysis

## A.

## Standard of Review

We review the ALJ's decision directly, but we play an "'extremely limited'" role. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). "We do not actually review whether [the claimant] is disabled, but whether the . . . finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The court may not reweigh evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citing *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000)). However, despite this deferential standard, the court cannot "'rubber stamp'" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (quoting *Ehrhart*

*v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992)). The ALJ's decision must allow the court to assess the validity of the findings and afford the plaintiff a meaningful judicial review. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). This standard is satisfied if the ALJ articulates, "at some minimum level, his analysis of the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

### B.

### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1)  is the plaintiff currently unemployed;

2)  does the plaintiff have a severe impairment;

3)  does the plaintiff have an impairment that meets or medically equals one of the impairments listed as disabling in the Commissioner's regulations;

4)  is the plaintiff unable to perform his past relevant work;

5)  is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520(4); *Simila*, 573 F.3d at 512–13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). An affirmative answer leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920(4)(i)–(v); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005). A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i)–(v); *see Briscoe*, 425 F.3d at 352. The claimant bears the burden of proof

through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352 (citing *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)).

**C.**

**Mr. Robinson's Arguments**

Mr. Robinson raises two arguments for reversal and remand: (1) the ALJ 's rejection of Dr. Elmes' assessment was not supported by substantial evidence; and (2) the ALJ failed to adequately consider Mr. Robinson's medication side effects in her RFC assessment. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev. 6, 9).

**1.**

**Rejection of Dr. Elmes' Opinion**

The ALJ concluded that Dr. Elmes' "physical assessment [was] more extreme than his only mildly abnormal clinical findings and finding of symptom magnification," and the ALJ gave "great weight" to the ME's physical assessment as "most consistent with the medical evidence of record." (R. 19–20). Mr. Robinson argues that the ALJ's analysis was conclusory and "failed to show 'specific legitimate reasons constituting good cause'" for discounting Dr. Elmes' assessment. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev. 7–8).

Mr. Robinson's contentions are unpersuasive. When faced with conflicting medical evidence, it is the ALJ's responsibility to resolve that conflict, *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)), and the ALJ must weigh a variety of factors. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). An ALJ can give less weight to a doctor's opinion if it is internally inconsistent or inconsistent with the other substantial evidence in the record as long as the ALJ articulates reasons for giving the opinion less weight, 20 C.F.R. § 404.1527(c)(3), (4); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011);

*Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir.2004). And that's exactly what the ALJ did here.

When the reviewing court considers the ALJ's assessment, it should not substitute its own analysis or reweigh the evidence. *See Terry*, 580 F.3d at 475. Rather, if the ALJ's assessment is supported by substantial evidence, it should be affirmed. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

In discounting the physical assessment of Dr. Elmes, the ALJ reasoned that his physical assessment was more extreme than his clinical findings and finding of symptom magnification, and noted that the ME also disagreed with Dr. Elmes' physical assessment given Mr. Robinson's normal gait and "relatively good range of motion of the lumbar spine." (R. 20). The ALJ noted that the ME assessed that Mr. Robinson had the RFC to perform a limited range of light work, and that the state agency medical consultants had also come to the same conclusion. (R. 20). Contrary to Mr. Robinson's argument, the ALJ also considered other factors in discounting Dr. Elmes' opinion.

The ALJ noted, for example, that the record "d[id] not contain any opinions from treating or examining physicians indicating that the claimant [was] disabled or even ha[d] limitations greater than those determined in this decision," and reasoned that "[g]iven [Mr. Robinson's] allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor." (R. 21). The ALJ concluded that "[o]verall, the claimant did not generally receive the type of treatment one would expect for a totally disabled individual." (R 21). The ALJ noted that the record revealed significant gaps in the treatment history and infrequent trips to the doctor, and that the treatment that Mr. Robinson did receive was "essentially routine and/or conservative." (R. 21). The ALJ

30

acknowledged that Mr. Robinson had been medically indigent until recently, but asserted that given Mr. Robinson's emergency room visits, he was capable of seeking medical treatment, "suggesting that the claimant's lack of more regular emergency room or public health clinic visits was because his symptoms were not as limiting or disabling as he ha[d] alleged in connection with the current application." (R. 21).

Further, the ALJ considered the medical evidence of record including the X-rays of Mr. Robinson's shoulder from August 23 and September 13, 2007 which revealed no evidence of fracture or dislocation, (R. 15–16), the X-ray of Mr. Robinson's right shoulder taken on October 15, 2007 which "showed only slight narrowing of the joint space" consistent with early and mild arthritic changes, and his emergency room visits during which he was continually diagnosed with arthritis of the right shoulder. (R. 15–16). The ALJ also noted that state agency medical consultants reviewed the record on February 15 and June 2, 2008 and concluded that Mr. Robinson had the RFC to perform light work. (R. 18).

During the consultative examination with Dr. Elmes on September 15, 2009, Mr. Robinson reported that an X-ray of his lumbosacral spine in 2008 revealed no evidence of fracture. (R. 16). He was capable of dressing himself, had normal fine and gross motor coordination, had no measurable atrophy of the upper or lower extremities, and examination of Mr. Robinson's low back revealed mild tenderness, but no palpable spasm or atrophy. (R. 17). The ALJ noted that at the September 15, 2009 psychological consultative examination, Mr. Robinson's gait, posture, and mannerisms appeared to be within normal limits. (R. 17).

In addition, the ALJ noted that Mr. Robinson had performed unskilled work at a heavy exertional level in the past and had been able to function independently (including taking public transportation by himself). (R. 22). Although the ALJ May not have explicitly discussed these

31

factors when discounting the opinion of Dr. Elmes, the ALJ did more than enough. He didn't have to recite the considerations applicable to assessing a medical opinion chapter and verse; it is enough that he minimally articulates his reasons and they are supported in the record. *Henke v. Astrue*, 2012 WL 6644201, 3 (7th Cir. 2012); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008).

Moreover, an ALJ's decision is due a "commonsensical" reading, and given the ALJ's assertion that the ME's assessment was more consistent with the evidence of record, it is clear that the ALJ considered the necessary factors. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1997) (citations omitted).[4]

Mr. Robinson also argues that the ALJ failed to explain how the ME's and Dr. Elmes' specialties affected her evaluation of their opinions. (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev.

---

[4] The parties disagree as to whether the ALJ, in her rejection of Dr. Elmes' assessment, needed to give "specific, legitimate reasons constituting good cause," (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev. 6–7), or merely "explain" the weight given the physicians' opinions. (Def.'s Mem. Supp. Mot. Summ. J. 4). These linguistic variations essentially describe the same standard, and arise from the weight the ALJ decides to give to an opinion after considering a number of factors including "whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion." *See Books*, 91 F.3d at 979.

For example, an ALJ must take into account a treating physician's ability to observe the claimant over an extended period of time. *Id.* The main inquiry, however, is whether the ALJ adequately articulates, "at some minimum level, her analysis of the evidence," *Dixon*, 270 F.3d at 1176, and in this case, the ALJ satisfied that standard, and her decision to discount Dr. Elmes' physical assessment is supported by substantial evidence. Here, a treating physician's opinion was not improperly discounted in favor of the opinion of a consulting physician. *See, e.g.*, *Books*, 91 F.3d at 979.

Nor was an examining physician's opinion improperly discarded in favor of a non-examining physician's opinion. *See,e.g.*, *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Rather, Dr. Elmes' assessment was internally inconsistent and inconsistent with the assessments of several other examining and non-examining physicians, and therefore, the ALJ's decision to discount this assessment after weighing the evidence is sufficient. *See Young*, 362 F.3d at 1001–02 (upholding an ALJ's decision to discount the assessment of an examining physician when the examining physician's opinion was contradicted by several other examining and non-examining physicians); *see also Diaz*, 55 F.3d at 306 n.2 (noting that if medical evidence conflicts, the ALJ has the responsibility to resolve that conflict).

7).  Mr. Robinson suggests that Dr. Elmes' assessment should have outweighed the assessment of the ME because Dr. Elmes was the examining orthopedist, and the ME did not examine Mr. Robinson and is not an orthopedic surgeon.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev. 7).  However, the fact that the ME is not an orthopedist and did not examine Mr. Robinson does not disqualify his opinion, and merely "underscore the importance to a rational decision of taking account of the other medical evidence in the record, especially the evidence given by a specialist in the relevant disease who actually examined the applicant."  *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (citations omitted).

In this case, however, the ALJ took Dr. Elmes' assessment into consideration, (R. 19), but merely concluded that the assessment was internally inconsistent and inconsistent with the evidence of record.  (R. 20).  This is not a case, as in *Groves*, where the ALJ relied entirely on the opinion of a non-examining physician who was not an orthopedist in discounting the examining orthopedist's assessment.  *See id.*  Rather, as explained above, the ALJ discounted Dr. Elmes' opinion as inconsistent with the evidence of record as a whole including the ME's testimony, the conclusion of the state agency physicians that Mr. Robinson could perform light work, Dr. Elmes' own clinical findings, the absence of opinions by treating physicians that Mr. Robinson was disabled, and essentially routine and conservative medical treatment.  (R. 18–21).  Therefore, the ALJ's decision to discount Dr. Elmes' assessment was sufficient.  *See Young*, 362 F.3d at 1001–02.

Finally, Mr. Robinson argues that the ALJ's only basis for rejecting Dr. Elmes' assessment was the ALJ's own opinion, and thus maintains that the ALJ improperly "played doctor" by substituting her own interpretation for Dr. Elmes' assessment.  (Pl.'s Mem. Supp. Pl.'s Mot. Summ. Rev. 8–9). An ALJ, of course, may not "play doctor" and substitute her own

opinion for a physician's without relying on other medical evidence in the record. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). However, the ALJ must weigh the evidence in the record and resolve conflicts, if necessary. *See Diaz*, 55 F.3d at 306 n.2.

In this case, the ALJ discounted Dr. Elmes' opinion after considering the testimony of the ME, Dr. Elmes' own clinical findings, the conclusion of the state agency medical consultants that Mr. Robinson could perform light work, Mr. Robinson's trips to the emergency room, his X-rays, and the absence of opinions from treating or examining physicians indicating that Mr. Robinson was disabled. (*See* R. 15–21). Therefore, the ALJ adequately considered the medical evidence of record and sufficiently constructed a "logical bridge." *Diaz*, 55 F.3d at 306–07.

### 2.

### Sufficiency of the ALJ's Credibility Determination

In her RFC assessment, the ALJ reasoned that Mr. Robinson's "alleged side effects of sleepiness and drowsiness [we]re not supported by the evidence of record," and concluded that Mr. Robinson's use of medication did not suggest the presence of an impairment more limiting than found in the decision. (R. 21). Mr. Robinson argues that the ALJ's RFC assessment was incomplete "because it failed to properly consider his side effects and failed to provide a function-by-function analysis." (Reply Mem. Supp. Pl.'s Mot. Summ. Rev. 6). The essence of Mr. Robinson's argument is that this aspect of the ALJ's credibility determination was conclusory, and that therefore, the ALJ did not adequately consider the impact of Mr. Robinson's alleged side effects in her RFC assessment. (Reply Mem. Supp. Pl.'s Mot. Summ. Rev. 6).

Mr. Robinson's testimony is the only evidence of side effects in the record, and therefore, if the ALJ's adverse credibility determination with regard to the side effects was sufficient, the

ALJ had no obligation to account for the alleged mental limitations resulting from Mr. Robinson's side effects in her RFC assessment. Only the limitations that an ALJ finds credible need be included in the RFC. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007). Thus, Mr. Robinson necessarily challenges the adequacy of this aspect of the ALJ's credibility determination.

"Because the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record." *Dixon*, 270 F.3d at 1178–79. Accordingly, the court "will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken." *Simila*, 573 F.3d at 517 (citing 20 C.F.R. § 404.1529(c)(2)–(4); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)). In the end, the decision is left to the ALJ. *See id.*

As an initial matter, Mr. Robinson argues that the ALJ "gross[ly] mischaracteriz[ed]" his testimony and discounted his allegations of side effects because he only testified about his side effects when "prompted" by his attorney, when in fact, Mr. Robinson had testified about his side effects on his own before that time. (Mem. Supp. Pl.'s Mot. Summ. Rev. 10). Although the ALJ did note that Mr. Robinson initially testified that his only side effect was dry mouth, but alleged "that his medication puts him to sleep and causes drowsiness" after being "prompted by his representative," the ALJ's basis for discounting Mr. Robinson's alleged side effects was the lack of support for such allegations in the record. (*See* R. 21).

As for the credibility determination, Mr. Robinson's allegations of drowsiness are the only evidence of side effects in the record, and in making a credibility determination, an ALJ is entitled to consider the utter lack of medical evidence supporting a claimant's allegations. *See Simila*, 573 F.3d at 519. But the ALJ also considered other evidence and went on to discuss the fact that Mr. Robinson had been able to function independently (including taking public transportation by himself) and performed unskilled work as a home attendant and a construction worker in the past. (R. 21). Further, the ALJ noted that evidence in the record regarding Mr. Robinson's statements concerning cocaine use indicated that he might not have been "an entirely reliable source," and that the record did not contain opinions from treating or examining physicians indicating that Mr. Robinson had limitations greater than those determined in the decision. (R. 21–22).

Given the lack of medical evidence supporting Mr. Robinson's allegations, and the ALJ's consideration of other factors such as Mr. Robinson's independence, reliability, and capacity to perform unskilled work, it is difficult to determine what other explanation Mr. Robinson would require from the ALJ. The ALJ's credibility determination was not conclusory as Mr. Robinson alleges, and consequently, the ALJ's assessment that Mr. Robinson's side effects would not inhibit his ability to work is not deficient. *See Rice v. Barnhart*, 384 F.3d 363, 370–71 (7th Cir. 2004) (upholding the ALJ's adverse credibility determination, and consequently the ALJ's conclusion that the claimant was not disabled).

Moreover, there were, as the ALJ noted, other reasons to doubt Mr. Robinson's allegations. He simply was not a credible witness. As the ALJ pointed out, Mr. Robinson lied about his illegal drug use. Of course, lies and inconsistent statements provide a valid basis for finding a witness not credible. *Wurst v. Colvin*, 2013 WL 1501941, 2 (7th Cir. 2013); *Long-Gang*

*Lin v. Holder*, 630 F.3d 536, 544 (7th Cir. 2010); *Hill v. Astrue*, 295 Fed.Appx. 77, 81 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).  The ALJ also pointed out that the medical evidence – specifically Waddell's signs – suggested that Mr. Robinson was exaggerating his symptoms.  Accordingly, the ALJ's credibility determination cannot be said to be patently wrong – far from it – and must stand.  *Pepper v. Colvin*, 712 F.3d 351, – (7th Cir. 2013); *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir.2008)

## CONCLUSION

The Commissioner's motion to affirm the ALJ's decision is granted, and the Plaintiff's motion is denied.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 5/8/13